UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CENTRAL SPORTS, INC., | : |
|     Plaintiff, | : |
| | :    **Case No. 3:04CV1013 (JBA)** |
| v. | : |
| | : |
| YAMAHA MOTOR CORP., U.S.A., | : |
|     Defendant. | : |

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. #50]

Plaintiff brought suit against defendant in Connecticut Superior Court for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Connecticut Franchise Act ("CFA"), and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). (See Am. Compl. [Doc. # 18].) Defendant removed the case to federal court invoking diversity jurisdiction, 28 U.S.C. § 1441, and interposed counterclaims of tortious interference and CUTPA violation (Def. Ans. [Doc. #19] at 7-9). For the following reasons, Defendant's Motion for Summary Judgment [Doc. #50] is granted on plaintiff's claims[1] and denied on its counterclaims.

## I. Factual Background

Central Sports, Inc. ("Central Sports"), a Connecticut corporation, was an authorized franchisee of Yamaha motorcycles and products with its principal place of business and one

---

[1] Plaintiff's "Second Count: (Common Law Injunctive Relief)" (Am. Compl. [Doc. #18] at 4-5), while styled as a substantive claim, in fact only articulates a remedy sought.

dealership in Taftville, Connecticut and another dealership in
Plainfield, Connecticut, which was later sold.  (Pl. 56(a)(2)
[Doc. #62-5] ¶ 11; Burchman Dep., Def. Ex. 51 [Doc. # 69-40], at
19.)  Brian Burchman is president of Central Sports.  (See
Burchman Aff., Pl. Ex. 1.)  On June 22, 1977, plaintiff entered
into a franchise contract with Yamaha Motor Corp., U.S.A.
("YMUS"), a California corporation distributing Yamaha
motorcycles in the United States.  (1977 Dealer Agrmt., Def. Ex.
2 [Doc. #68].)  Subsequently, plaintiff entered into other,
similar contracts with defendant for snowmobiles, Riva scooters,
Moto-4s, and related products.  (See Dealer Agreements, Def. Exs.
2-6 [Docs. ## 68, 69-3].)  For the purposes of this motion, the
1977 Agreement is the operative contract.

The 1977 Agreement required plaintiff "to maintain . . .
adequate working capital and lines of wholesale credit" (Def. Ex.
2 ¶ 5.05) through floorplan financing agreements[2] in order to

_____

[2] The use of floorplan financing:

allows a dealer to have the product in their [sic.]
store without having to pay up front.  It allows the
manufacturer to get the product on the store's floor
without carrying the receivable on their books. . . .

In simple terms, a dealer orders units, the units get
shipped to the dealer and the floorplan company charges
the dealer's account and pays the manufacturer.  As a
unit is sold by the retailer it is paid off with the
floorplan company.  Periodically the floorplan company
visits the dealer and counts the unsold units, called a
floor check.  It is important to make sure the unit is
still there since the unit is the collateral or if sold

maintain an inventory of defendant's products (Pl. 56(a)(2) ¶ 6).
To this end, plaintiff Central Sports entered a "pay as sold"
financing agreement with Deutsche Financial Services ("DFS"),
then YMUS's authorized wholesale financer (Vivrette Expert
Report, Def. Ex. 8 [Doc. # 69-5] at 2; Def. Mem. [Doc. # 69] at
3). Plaintiff struggled to meet the terms of this agreement
between 1997 and 2002. (See DFS documents, Def. Exs. 11, 13-25
[Docs. ## 68, 69-9 – 69-16].)[3] On June 1, 1998, YMUS sent the

---

has been paid for with the floorplan company.

(Vivrette Expert Report, Def. Ex. 8 at 2.)

[3] On October 31, 1997, DFS denied plaintiff's application for
a credit line increase from $465,000 to $600,000, reporting
$401,000 outstanding. (Def. Ex. 15 [Doc. # 69-11].) In a
December 9, 1997 letter to plaintiff, DFS stated, "our policy
requires weekly release[s] be made to DFS for sold inventory. . .
. If your habits do not improve to weekly releases, you will
leave us no alternative but to require an Irrevocable Letter of
Credit." (Def. Ex. 11 [Doc. # 69-8].) On March 13, 1998, DFS
suspended Central Sports's line of credit and required plaintiff
to supply both an irrevocable letter of credit for $150,000 and
certified funds for 60 days (Def. Ex. 13 [Doc. # 69-9]); the line
of credit was reinstated on June 19, 1998 (Def. Ex. 14 [Doc. #
69-10]).
     The irrevocable letter of credit required by DFS was
increased to $250,000 on December 6, 2000 (Def. Ex. 17 [Doc. #
69-13]), and as of December 7, 2000, plaintiff owed DFS $536,219
(Def. Ex. 16 [Doc. # 69-12]). By February 16, 2001, plaintiff
had agreed to a reduction in its line of wholesale financing from
DFS to $400,000, but was still required to provide a $100,000
irrevocable letter of credit. (Def. Ex. 18 [Doc. # 69-14].) On
April 24, 2001, DFS complained in a letter to Burchman that
Central Sports had failed to "make weekly remittance payments for
sold inventory each Friday," had submitted "[a] check returned by
[its] bank for non-sufficient funds," and had "failed to provide
financial statements for its fiscal year that ended in September
2000." (Def. Ex. 19 [Doc. # 69-15].) In letters dated June 22,
2001 and August 13, 2001, DFS informed plaintiff that plaintiff

first of three "Possible Termination of Dealer Agreement" letters
to Burchman, stating:

> I have received a request that Yamaha terminate
> its Dealer Agreement with your dealership due to your
> lack of a wholesale credit line with DFS. . . .
> I understand that you may have concerns about how
> you feel that you are being treated by DFS.  However,
> regardless of your personal feelings your lack of a
> credit line with DFS creates not only a material breach
> of our Dealer Agreement with you, but also makes it
> impossible to adequately display and sell our product
> to the retail public.

(See June 1, 1998 Possible Termination letter, Def. Ex. 26 [Doc.
# 69-17].)  The second such letter, dated August 6, 1998, also
referenced plaintiff's "failure to have an adequate credit line
with DFS" (Aug. 1, 1998 Possible Termination letter, id.).  Dated
April 24, 2001, the third of these letters stated, "At this time
you have a credit line with DFS of only $400,000 for two
dealerships.  This is inadequate for two dealerships in your
market area, . . . At this time, we are being forced to seriously
consider initiating a termination of both of your dealerships for
these credit/sales reasons."  (Apr. 24, 2001 Possible Termination
letter, id.)

On September 24, 2001, DFS informed plaintiff that its
wholesale financing agreement would be terminated by December 25,
2001 "based on a number of factors, including the poor financial

---

had defaulted on payments and requested information about a
discrepancy in plaintiff's financial statements.  (Def. Exs. 20
[Doc. # 69-16], 21 [Doc. #68-7].)

performance of Central Sports and its history of making untimely payments to DFS under the pay as sold program." (Def. Ex. 22 [Doc. #68-8].) Termination was postponed by a forbearance agreement until January 21, 2002 at plaintiff's request (Def. Exs. 23, 24 [Docs. ## 68-9, 68-10]), but because plaintiff "fail[ed] to: (1) make weekly remittances to DFS for inventory sold; and (2) provide its audited business fiscal year-end financial statement," DFS cut short the forbearance period and terminated the financing agreement with plaintiff on January 10, 2002 (Def. Ex. 25 [Doc. #68-11]).

After this, Central Sports and YMUS agreed that plaintiff could continue to operate its two dealerships "without an adequate flooring [sic] line of credit" for 60 days beginning March 11, 2002 (Def. Ex. 30 [Doc. # 69-21]), provided that plaintiff sought another financing source (Pl. 56(a)(2) ¶ 35). Preferring to work with financer Textron (id.), with whom plaintiff already had a relationship, plaintiff requested that Textron increase its pre-existing financing line from $50,000 to $500,000 (id. ¶ 39). Textron refused this request and continued furnishing a $50,000 line of credit to plaintiff. (Textron Write-Up, Def. Ex. 33 [Doc. #68-12].) As of August 7, 2002, plaintiff's Plainfield store had been sold, and "a buy/sell" was signed but not yet completed for the Taftville store. (See Jura letter, Def. Ex. 35 [Doc. # 69-24].)

YMUS sent Central Sports a letter dated December 30, 2002 that gave 90 days' notice of termination of the dealer agreement. (Def. Ex. 38 [Doc. # 69-27]; Pl. 56(a)(2) ¶ 69.) The letter listed the "reasons for this termination" as including "you do not have a wholesale line of credit that is adequate," "you have not purchased and do not have a reasonable inventory of our Products," "you do not have a prominent display of the entire line of our Products," and "you are past due funds owed" [sic]. (Id.; Pl. 56(a)(2) ¶¶ 67, 68.) Central Sports admits having received the letter and not having obtained other financing before expiration of the 90-day notice period. (Pl. 56(a)(2) ¶ 71.) The buy/sell for the Taftville store was still being drafted as of March 28, 2003 (Pl. 56(a)(2) ¶ 47; Jura e-mail, Def. Ex. 39 [Doc. # 69-28]), and YMUS agreed to furnish parts cash-on-delivery while plaintiff completed the sale (Pl. 56(a)(2) ¶ 52) and to repurchase leftover inventory in accordance with the 1977 contract (Def. Ex. 2 ¶ 7.04). The parties dispute the details of these post-termination arrangements: defendant contends that plaintiff failed to provide the inventory list that YMUS required (Barker e-mail, Def. Ex. 46 [Doc. # 69-35]; Jura e-mails, Def. Exs. 47 [Doc. # 69-36], 48 [Doc. # 69-37]), while plaintiff maintains via the Burchman affidavit that it twice sent defendant the inventory list but never received any response (Pl. 56(a)(2) ¶¶ 58-60).

Defendant YMUS contends that it "validly terminated its franchise because Plaintiff had materially breached the contract between the parties by failing to comply with the material elements of the applicable Dealer Agreement concerning adequate wholesale financing" and should thus be granted summary judgment on all claims and counterclaims. (Def. Mem. [Doc. # 69] at 1.)

## II. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). The duty of the court is to determine whether there are issues to be tried and in making that determination, the Court must draw all factual inferences in favor of the party opposing the motion, viewing the factual disputes among materials such as affidavits, exhibits, and depositions in the light most favorable to that party. See Phaneuf v. Fraikin, 448 F.3d 591, 595 (2d Cir. 2006). "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record

from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).

"A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex v. Catrett, 477 U.S. at 324 (1986)). The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her favor, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986), not merely "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III. Discussion

### A. Plaintiff's claims

#### 1. Count One: Connecticut Franchise Act

The first count of plaintiff's Complaint is brought under the Connecticut Franchise Act ("CFA"), Conn. Gen. Stat. § 42-133r et seq., which governs the performance of contracts between

manufacturers/distributors (franchisors) and dealers
(franchisees).  Under the statute, a franchisor must not
"terminate or fail to renew any franchise with a licensed dealer
unless the manufacturer or distributor has satisfied the notice
requirement. . ., has good cause for cancellation, termination or
nonrenewal and has acted in good faith."  Conn. Gen. Stat. § 42-
133v(a).  Good cause does not exist where the franchisor requires
the franchisee to "meet unreasonable minimum standards," Conn.
Gen. Stat. § 42-133v(f)(4).

     Defendant denies plaintiff's claims and maintains that its
conduct comported with the CFA requirements of notice, good
cause, and good faith.  First, in accordance with the statutory
notice requirements, Conn. Gen. Stat. § 42-133v(d), defendant
sent a letter by certified mail giving plaintiff 90 days' notice
of termination, which plaintiff acknowledges receiving (see Def.
Ex. 38 [Doc. # 69-27]; Pl. 56(a)(2) ¶¶ 44, 45).  Second,
defendant claims it had good cause to terminate, as there was "a
failure by the dealer to comply with a provision of the franchise
which is both reasonable and of material significance to the
franchise relationship," Conn. Gen. Stat. § 42-133v(b), namely
Central Sports' failure to maintain a financing source pursuant
to ¶ 5.05 of the original Dealer Agreement and its failure to
purchase and maintain reasonable inventory under ¶ 2.04 of the
same.  (See Def. Ex. 2 ¶¶ 2.04, 5.05; see also Barocci Expert

9

Report, Def. Ex. 7 [Doc. # 69-4] at 7-11, synthesizing plaintiff's financial records.)

Plaintiff does not dispute that it failed to maintain the line of credit required by the contract with YMUS, which is clear from the correspondence in the record between DFS and plaintiff, and Textron and plaintiff. It does, however, argue that the terms were unreasonable and that "the defendant restricted [its] ability to obtain financing by having a sole approved source for floor plans and other types of financing. Whether it was Textron, Deutsche Bank, or GE Credit, the plaintiff did not have the option to go elsewhere." (Pl. Opp. Mem. at 8.) Thus, as plaintiff posits improper motive on the part of defendant, its argument with respect to "good cause" bears on the element of good faith, and the two must be considered together.

First, this Court has previously held that lack of floor plan financing is good cause for termination of a franchise, where the governing contract requires such financing. See Chic Miller's Chevrolet, Inc. v. General Motors Corp., 352 F. Supp. 2d 251, 257-59 (D. Conn. 2005). Although it is undisputed that plaintiff lost its line of credit with DFS and failed to secure an adequate line with Textron, according to Burchman's affidavit, "Yamaha wanted to force Plaintiff out. . . Plaintiff has had a $500,000 line of credit with People's Bank. Without reasonable explanation to Plaintiff, Yamaha refused to allow Plaintiff to

10

use People s [sic] Bank as a financing source for their
products." (Burchman Aff., Pl. Ex. 1, ¶¶ 4, 6.) "Yamaha
prevented [it] from obtaining proper financing, treated [it]
unfairly, and eventually drove [it] out of business" (Pl. Opp.
Mem. at 9). Bad faith termination might be shown if Burchman's
statement that YMUS unreasonably rejected a fully conforming
$500,000 line of credit from People's Bank could be proved.
Viewed in the light most favorable to plaintiff, the fact that
the Agreement requires no particular financier from which
plaintiff had to obtain and maintain its line of credit but that
DFS was YMUS's "authorized wholesale financer" (Def. Mem. at 3)
begins to explain plaintiff's perception of unfairness:
"regardless of your personal feelings your lack of a credit line
with DFS creates . . . a material breach of our Dealer Agreement
with you" (June 1, 1998 Possible Termination letter, Def. Ex.
26). But People's Bank employee Arthur Barton testified that
plaintiff applied for a $500,000 line of credit with People's
Bank in July 2000 (Barton Dep., Def. Ex. 31 [Doc. # 69-22], at
28) and that as of March 12, 2002 plaintiff had a $100,000
standby letter of credit through People's Bank with DFS as
beneficiary (id. at 88). Plaintiff offers no other evidence of
its dealings with People's, particularly any evidence that it had
a $500,000 credit line solely for use by its Taftville dealership
or that it presented such a line to defendant following DFS's

11

termination.  Indeed, in its response to defendant's first set of interrogatories on May 31, 2005, plaintiff stated that it had only a $100,000 line of credit:

> Interrogatory No. 15
> Please state the basis, with specific reference to the definition provided herein, for your allegations that YMUS's termination of the Subject Franchise was based upon unreasonable minimum standards relating to:
> a.   capital requirement; . . .

Answer:   a.   100K Line of credit from People's Bank[4] (Def.'s Interrogs # 15.a; Pl.'s Responses # 15.a, Def. Ex. 53 [Doc. # 69-42]).  Burchman's statement that plaintiff "has had" a $500,000 line of credit is unsubstantiated by any documentation as to date, dealership, or accessibility, and plaintiff proffers no evidence it even offered an alternative, satisfactory line of credit to defendant.

The record shows that during plaintiff's long, difficult relationship with DFS, YMUS pursued some accommodation to plaintiff instead of immediately resorting to termination.  (See Possible Termination letters, Def. Ex. 26 [Doc. # 69-17].)  On

---

[4] Subsequently, plaintiff amended its response as follows on October 18, 2005:

ANSWER:

Minimum standards and requirements were not defined in the original Franchise Agreement.  Franchise was abruptly terminated in 2002 based on discriminatory and inadequately defined requirements.

(Pl.'s Supplemental Answers # 15, Def. Ex. 53.)

March 13, 1998, the same day DFS informed plaintiff that its
credit facility was put on hold, YMUS notified plaintiff that it
was in violation of the franchise agreement due to its lack of
"an active credit line" and subsequently followed up with three
possible termination letters before giving notice of termination
over four years later in December 2002.  (Mar. 13, 1998 DFS
Letter, Def. Ex. 13 [Doc. # 69-8]; Dealer Cancellation Request,
Def. Ex. 27 [Doc. # 69-18]; Possible Termination Letters, Def.
Ex. 26; Termination Letter, Def. Ex. 38 [Doc. # 69-27].)  The
contemporaneity of the DFS hold letter and the YMUS notification
on March 13, 1998 shows that YMUS fulfilled its CFA obligation of
notifying plaintiff of its failure to comply with a reasonable,
material franchise provision within 180 days of learning of that
failure under Conn. Gen. Stat. § 42-133v(b)(1); defendant also
gave plaintiff more than six months to substantially progress
towards compliance with YMUS's performance criteria as required
under § 42-133v(b)(2).

Indeed, even after termination became final, plaintiff
admits that "YMUS agreed to allow Plaintiff to continue for a
period of time without financing while arrangements were made for
an adequate line [of credit]."  (Pl. 56(a)(2) ¶ 36.)  Defendant's
undisputed evidence[5] that plaintiff failed to maintain the

_____

[5] Burchman's affidavit statements of what Mark Pearson and
Ken Smith told him about defendant are clearly hearsay and must
be disregarded.  (See Burchman Aff. ¶¶ 7, 9.)  Similarly

required line of credit (Pl. 56(a)(2) ¶¶ 30, 31), that defendant

agreed plaintiff would seek another financing source (id. ¶ 35),

that plaintiff tried unsuccessfully to obtain financing with

Textron (id. ¶¶ 39, 42), and that defendant allowed plaintiff

time to make other credit line arrangements (id. ¶ 36) shows that

no reasonable fact-finder could find defendant breached the CFA

due to lack of good cause or good faith in terminating the

franchise agreement, and defendant is therefore entitled to

summary judgment on Count One.[6]

## 2. Count Three: Breach of contract

Defendant argues that "Plaintiff has not provided any

specific contractual provision that was violated by YMUS" and

that plaintiff's breach of contract claim is therefore

indistinguishable from plaintiff's claim for breach of the

implied covenant of good faith and fair dealing. (Def. Mem. at

20-21.) Plaintiff appears to concede this argument, stating

that, "Here, the plaintiff has alleged that Yamaha prevented him

---

Burchman's postulation of defendant's motive to move to only
single line dealerships is devoid of any showing of personal
knowledge and is not considered. (See id. ¶ 9.)

[6] It is thus unnecessary to address defendant's other
arguments: that "[e]ven if plaintiff were to establish a
violation of the Franchise Act, plaintiff's claims should be
barred by the equitable doctrine of laches" (Def. Mem. at 25);
that the CFA, which was passed in 1982, should not retroactively
govern the 1977 Agreement (id. at 27-30); or that the Contracts
Clause, U.S. Const. art. 1 § 10, cl. 1, prevents the CFA from
"substantially impairing" the Agreement (id. at 30-33).

from obtaining proper financing, treated him unfairly, and eventually drove him out of business. . . . If proved these facts could lead to a conclusion that Yamaha has not acted in Good Faith and Fair Dealing, thereby breaching the implied covenant." (Pl. Opp. Mem. at 9-10.)  In the absence of any reference to a specific contractual provision claimed by plaintiff to have been breached by defendant's conduct, defendant is granted summary judgment on plaintiff's breach of contract claim.

### 3. Count Four: Breach of the implied covenant of good faith and fair dealing

Under Connecticut law, every contract contains an implied covenant of good faith and fair dealing, violation of which is actionable in tort.  See De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 849 A.2d 382, 387-88 (Conn. 2004).  "Bad faith" has been defined as "the absence of good faith . . . generally impl[ying] 'a design to mislead or to deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation.'" Stetzer v. Dunkin' Donuts, Inc., 87 F. Supp. 2d 104, 115 (D. Conn. 2000) (citing Buckman v. People Express, Inc., 530 A.2d 596, 599-600 (Conn. 1987)).  Breach of the implied covenant of good faith and fair dealing is "'not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.'  Bad faith means more than mere negligence; it involves a dishonest purpose." Habetz v. Condon, 618 A.2d 501, 504 (Conn. 1992).

15

Plaintiff first argues that defendant breached the covenant by "refus[ing] to allow [plaintiff] to go elsewhere for financing, and when faced with the demands of the sole approved lender (DFS), the plaintiff was not able to satisfy their demands." (Pl. Opp. Mem. at 10-11.) YMUS asserts that "Plaintiff's allegations are insufficient because Plaintiff has not established any interested or sinister motive" in "prevent[ing plaintiff] from receiving the benefits of the contract." (Def Mem. at 21.) The record shows that defendant terminated the contract with plaintiff due to plaintiff's failure to maintain "a wholesale line of credit that is adequate to meet [its] obligations under [the] Dealer Agreement" (Def. Ex. 38 [Doc. # 69-27]; see Def. Ex. 2 ¶ 5.05). The insufficiency of plaintiff's evidence of its claim that "Yamaha refused to allow Plaintiff to use People[']s Bank as a financing source for their products" (Burchman Aff., Pl. Ex. 1, ¶ 6) is discussed above. Burchman's conclusory statement that "Yamaha applied undue pressure on DFS to terminate Central Sports" (id. ¶ 9) is unsupported by any showing of personal knowledge as to dealings between YMUS and DFS.

Moreover, there is no evidence supporting plaintiff's contention that defendant was obligated to find it a willing creditor, and plaintiff does not claim it was a financial novice to whom defendant had offered its assistance. Even if YMUS had a

16

strong preference for DFS as creditor for Central Sports, as discussed _supra_, this alone is no evidence of improper motive, and plaintiff offers no evidence that it instead had at that time an adequate alternative financing agreement with People's Bank or any other financier, or that defendant had refused any alternative plaintiff proposed, before plaintiff's YMUS franchise was officially terminated in March 2003.

To the extent plaintiff claims defendant's bad faith — that the pretextual reason for termination was that YMUS intended "to get rid of multi-line dealerships" (Pl. Opp. Mem. at 5) — it alludes to the existence of "[t]acit agreements between representatives of Honda[7] and Yamaha to eliminate plaintiff's franchise" (Pl. Response to Def. Interrogs., May 31, 2005, Def. Ex. 53 [Doc. # 69-42]). Burchman's affidavit, which gives no basis for his "personal knowledge" and fails to "show affirmatively that [he] is competent to testify to the matters stated," Fed. R. Civ. P. 56(e), is inadequate evidence. Burchman's statement suggesting that plaintiff "has had" a satisfactory alternative financing source which defendant declined to accept is unsupported by plaintiff's responses to interrogatories directed to this allegation, nor by Barton's deposition or any other competent evidence from which a

---

[7] Plaintiff sued American Honda Motor Co., Inc. in 2000. _See_ Docket Sheet, _Central Sports, Inc. v. Amer. Honda Motor Co., Inc._, No. 3:00cv01255 (CFD) (D. Conn.), Def. Ex. 49.

reasonable factfinder could conclude that defendant's actions
were arbitrary or ill-motivated.  Defendant's Motion for Summary
Judgment will thus be granted on Count Four.

### 4. Count Five: CUTPA

Plaintiff must show that the defendant engaged in "unfair or
deceptive acts or practices in the conduct of any trade or
commerce" to establish a CUTPA violation.  Conn. Gen. Stat. § 42-
110b(a).  Three criteria are used in assessing whether a practice
is unfair, although all three need not be proved:[8] "(1) Whether
the practice, without necessarily having been previously
considered unlawful, offends public policy as it has been
established by statutes, the common law, or otherwise . . .; (2)
whether it is immoral, unethical, oppressive, or unscrupulous;
(3) whether it causes substantial injury to consumers,
competitors or other businesspersons."  Edmands v. Cuno, Inc.,
892 A.2d 938, 955 n.16 (Conn. 2006) (quoting Ventres v. Goodspeed
Airport, LLC, 881 A.2d 937, 969 (Conn. 2005)) (internal quotation
marks and alterations omitted).

Plaintiff invokes all three criteria, "alleg[ing] that
Yamaha prevented [it] from obtaining proper financing, treated
[it] unfairly, and eventually drove [it] out of business."  (Pl.
Opp. Mem. at 11-12.)  In moving for summary judgment on

---

[8] See Hartford Electr. Supply Co. v. Allen-Bradley Co., Inc.,
736 A.2d 824, 843 (Conn. 1999).

plaintiff's CUTPA claim, YMUS reiterates its argument that plaintiff has no evidence of bad faith or unfairness on defendant's part that could support a violation of CUTPA under the above-enumerated criteria. As discussed earlier, the plaintiff has failed to adduce evidence that the reasons presented by defendant for its decision to terminate the franchise were not reasonably based on objective factors, and plaintiff offers no evidence on which a fact-finder could conclude these reasons were pretextually given or otherwise evince bad faith or improper motive in connection with plaintiff's inability to obtain satisfactory financing before the franchise was terminated. Defendant is thus entitled to summary judgment on Count Five.

## B. Defendant's counterclaims

### 1. Count One: Tortious interference with defendant's business expectancy

Defendant moves for summary judgment on its common law counterclaim against plaintiff for tortious interference with a business expectancy. In order to succeed on such a claim, YMUS must establish: (1) a business relationship between itself and another party; (2) Central Sports' knowledge of and intentional interference with the business relationship; and (3) actual loss resulting from the interference. See <u>Dreamcatcher Software Development, LLC v. Pop Warner Little Scholars, Inc.</u>, 298 F. Supp. 2d 276, 287 (D. Conn. 2004) (citing <u>High-Ho Tower, Inc. v.</u>

Com-Tronics, Inc., 761 A.2d 1268, 1273 (Conn. 2000)).  Defendant

must additionally prove "independent tortious conduct," Paint

Prods. Co. v. Minwax Co., Inc., 448 F. Supp. 656, 658 (D. Conn.

1978), i.e., that Central Sports "engaged in fraud,

misrepresentation, intimidation or molestation, or that [it]

acted maliciously," Windover v. Sprague Techs., 834 F. Supp. 560,

568 (D. Conn. 1993) (citing Dacourt Group. Inc. v. Babcock

Indus., Inc., 747 F. Supp. 157, 161 (D. Conn. 1990)).  YMUS

argues that it is undisputed that Central Sport's president

Burchman "filed suit because he wanted to remain a dealer and

that he knew the [Connecticut Franchise] statute would cause

delay[9] and prevent YMUS from establishing a new dealer in the

market area."  (Def. Mem. at 34-35.)

First, the Court must determine whether YMUS has

demonstrated it had a business relationship with some other

party.  YMUS proffers an expert report analyzing Central Sport's

profitability in relation to other Yamaha dealers within a 50-

mile radius of Taftville and predicting YMUS's lost profits

resulting from Central Sport's lackluster performance (Def. Ex. 7

[Doc. # 69-4] at 14-19) to support the claim that "absent any

legal challenge at that time, YMUS had no obstacles in its way to

establish a new dealership" (Def. Mem. at 35).  Central Sports

---

[9] I.e., by extending the franchise agreement for six months
following resolution of this litigation pursuant to Conn. Gen.
Stat. § 42-133v(g).

responds by noting "that there is no allegation that a specific contract, or potential contract has been interfered with." (Pl. Opp. Mem. at 17.)

Indeed, YMUS's expert evidence does not demonstrate the existence of any actual YMUS business relationship with another which could be interfered with, only an opinion that because the dealership could be profitable, YMUS would have had no difficulty finding a successor dealer. YMUS has not adduced evidence that it located or tried to negotiate with any potential franchisees, or had any in the wings, to succeed Central Sports prior to suit being brought. In the absence of any affirmative evidence supporting the existence of a prospective business relationship, YMUS has failed to establish the first element of its tortious interference counterclaim, and summary judgment on this counterclaim is denied.

### 2. Count Two: CUTPA

As discussed above, YMUS must prove that Central Sports engaged in "unfair or deceptive acts," Conn. Gen. Stat. § 42-110b(a), as measured against (1) public policy, (2) moral/ethical concerns, and/or (3) substantial injury to consumers or other businesspersons by the practice, see Edmands v. Cuno, Inc., 892 A.2d 938, 955 n.16 (Conn. 2006). A violation of CUTPA can be found based on one or more of these factors, and intent to deceive is not required. See Cheshire Mortgage Serv., Inc. v.

Montes, 612 A.2d 1130, 1143 (Conn. 1992).

According to YMUS, Central Sports's initiation of this lawsuit undermines the purpose of the Connecticut Franchise Act and has caused delay, thereby offending public policy; is unethical insofar as it tries to "obtain advantage" by false representations; and has caused substantial financial injury to YMUS, as illustrated by the Thomas A. Barocci expert report. (Def. Mem. at 36.) YMUS cites Burchman's deposition:

> Q   You understand that as part of the relief that is requested in this lawsuit, you're seeking to make sure that Yamaha not install another dealer in your location, correct?
>
> A   Absolutely.
>
> Q   Okay.  No doubt in your mind but that that was one of the purposes of the lawsuit being filed?
>
> A   Absolutely.  I wanted to be a dealer.
>
> Q   Well, you wanted to prevent them from putting someone else in place even though you're terminated, correct?
>
> A   Yes, sir.

(Burchman Dep., Def. Ex. 51 [Doc. # 69-40] at 175-76.)[10]  Central Sports denies that it "use[d] the Franchise [A]ct's protections in an offensive, rather than defensive, manner," and states that

---

[10] YMUS also submits a February 20, 2003 letter to plaintiff from attorney David Reif, who had advised plaintiff.  (Reif letter, Def. Ex. 50 [Doc. # 69-39] at 2.)  However, as this letter is marked "ATTORNEY CLIENT PRIVILEGE" and appears to be subject to attorney-client privilege, it will not be considered admissible evidence.

its "primary reason for filing the suit was unfair dealing and breach of contract by Defendant."  (Pl. 56(a)(2) ¶ 64.)

Plaintiff does not take issue with the theory that using a CFA suit solely to forestall substitution of a successor franchisee could violate public policy.  While it is undisputed that one purpose of Central Sports's lawsuit was continuation of its dealership, YMUS has not shown that Central Sports knew or believed its CFA and contractual claims totally lacked merit when suit was commenced.  Given that the CFA was intended "to protect individuals — particularly unsophisticated individuals — whose economic survival depends on a franchise relationship," Rudel Mach. Co., Inc. v. Giddings & Lewis, Inc., 68 F. Supp. 2d 118, 126 (D. Conn. 1999), the Court concludes that a threatened franchisee's suit to prevent the franchisor from taking an adverse action potentially precluding the CFA remedy sought, where the franchisee had a good faith, though erroneous, belief that the termination had been obtained unlawfully, is not "unfair or deceptive" conduct violating public policy.  In other words, Central Sports's motivation for suit to maintain its franchise and prevent YMUS from contracting with another dealer, without more, does not translate into unscrupulousness under CUTPA entitling YMUS to summary judgment.  Finding public policy to be per se offended under such circumstances would chill the use of CFA for its proper purpose: to provide adequate redress for

alleged improper franchise terminations.

Under the "substantial injury" prong of a CUTPA violation, unfairness exists if the injury satisfies three sub-tests: "It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided. . . . This test is equally applicable when a business person or competitor claims substantial injury." Rudel Mach. Co., 68 F. Supp. 2d at 129 (citing Williams Ford, Inc. v. Hartford Courant Co., 657 A.2d 212, 228 (Conn. 1995)).

YMUS relies on its expert reports to demonstrate that plaintiff's initiation of the lawsuit resulted in substantial financial injury to YMUS. Expert Barocci estimated that defendant's losses from April 3, 2004, when plaintiff first brought suit, to December 31, 2006, the anticipated date by which a replacement franchisee-dealer would reach "expected sales levels," were $328,214. (Barocci Expert Report, Def. Ex. 7 [Doc. # 69-4] at 15-18.) Plaintiff does not dispute these figures. However, given the inherently imbalanced power structure of the franchisor-franchisee relationship, the financial impact on defendant while this CFA litigation is pending is outweighed by the countervailing benefit to the plaintiff-franchisee, which has brought this litigation claiming good faith and has not

unreasonably prolonged or delayed its disposition.  Although plaintiff's CFA claim lacks sufficient evidence to warrant a trial, because defendant has failed to prove that plaintiff's actions violated public policy or were unscrupulous, despite the financial injury defendant may have suffered, the Court finds that the balancing of factors under CUTPA does not weigh in favor of summary judgment on Count Two of YMUS's counterclaims.

## IV. Conclusion

Accordingly, defendant's Motion for Summary Judgment [Doc. #50] is GRANTED on plaintiff's claims and DENIED on defendant's counterclaims.

IT IS SO ORDERED.

/s/

_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 15th day of March, 2007.**